And we'll hear first from Mr. Herrera. Yes, Your Honor. You have 15 minutes. You're dividing your time? Yes, Your Honor. You have 15 minutes. Can we change the clock so it says 15 minutes so that we keep awareness of the division? And then are you going to reserve time? Yes, Your Honor. I intend to reserve five minutes of my time. Okay. All right. Please proceed. Good morning. May it please the Court, my name is Ernest Herrera, and I will argue on behalf of the Mendoza appellants. I have two points to make. First, in 2011, this Court held that Tucson Unified School District failed to show a history of good faith compliance with the desegregation decree. We are here today because the school district still has not shown good faith compliance with the desegregation decree. Second, the school district has not established that it has eliminated the vestiges of past discrimination because it did not present sufficient evidence to show compliance with the unitary status plan. And in finding unitary status, the district court abandoned or changed standards that it set for compliance. I'll elaborate on my first point. Tucson Unified School District, or TUSD, did not follow court orders and has failed to track, review, monitor, and analyze the effectiveness of its programs. This court linked its ruling regarding the lack of good faith in 2011 to the district court's critical finding that Tucson Unified School District failed to monitor, track, review, analyze the effectiveness of its programs and policies and that TUSD failed to make the most basic inquiries necessary to assess the ongoing effectiveness of its student assignment plans, policies, and programs. This court then remanded this case to the district court to maintain jurisdiction until the school district made that central showing of good faith. The desegregation decree that TUSD has failed to follow in good faith since that 2011 decision is known as the USP. The USP was entered into after a special master had been appointed and by agreement of the parties and order of the court. This is a new decree after our prior remand. Correct, Your Honor. And you're not challenging the validity or the, that's not the right word, the substance of the plan, as though the plan was not sufficient. Correct, Your Honor, not of the unitary status plan itself. All right. We're challenging how the, that the fact that the USP was not applied correctly. Is the finding of good faith as a finding that we review for clear error? No, Your Honor. It's a finding we review de novo because it is a, it does involve deciding, it is a mixed question of fact and law. And so here, if we're in terms of good faith, this court said that good faith would have to involve monitoring, tracking, reviewing, and analyzing information to assess the effectiveness of programs. And we see that that did not happen in many areas of the USP. The partial and final unitary status orders from 2018, 2021, and 2022, in which the district court held that there was good faith compliance, also contained findings that TUSD failed to compile data or did so without using data. Other parts of the record also show TUSD's failures to compile or use data and information to assess the school district's compliance and desegregation efforts. The district court in 2018 granted, for example, granted partial unitary status as to various sections of the USP, including Section 5, which has to do with quality of education. One important aspect of Section 5 is equal access for Latino and African American students to advanced learning experiences, or ALEs as they're referred to. Which include programs such as gifted and talented education, honors programs, and advanced placement classes. As I'm sure the court is aware, access to such educational programming today is oftentimes a prerequisite for admission to college. However, in that partial unitary status order, the district court found that it was impossible to determine which strategies planned by the district to increase access and success in ALEs are effective. Rather than resolve the objections of Mendoza plaintiffs regarding deficiencies in strategies and put in place a way to measure such successes at that time, the district court resolved to make partial unitary status with regard to that section contingent on the development of the ALE policy manual. Put more plainly, the district court based compliance on a plan rather than on implementing that plan. Problem... I want to step back for a minute and make sure I have a clear understanding of your position about what good faith means. Is your argument that good faith means complete compliance with the plan? It would mean meeting the requirements of the USP, Your Honor. But also, it requires... Good faith requires... I'm sorry. Eliminating the vestiges of discrimination involves complying with all of the USP. So my understanding of the law here is we don't have a whole lot of direction about these two factors from the Supreme Court for unitary status, good faith and then the elimination of the vestiges of discrimination. It's kind of a... I don't want to say amorphous, but it's very factual, right? And so there's not a whole lot of precision in terms of a legal standard for those things. So that's why I'm trying to dig a little bit here in figuring out what it is that you think good faith means. So I'll give you a hypothetical. If you had a desegregation order that required 15 things and the district complied with 14 of them, is that good faith? Good faith would be found in that hypothetical, Your Honor, if there was a consistent pattern of legal conduct that was established to meet those certain requirements. It would also involve... I think this court gave direction on what good faith meant, gave elaboration on what the Freeman versus Pitt standard of good faith meant,  this court said that for this case... this court said that you have to... the school district would actually have to monitor, track, review and analyze information to assess the effectiveness of the program. So let me put that back in my hypothetical to make sure I understand your position. Again, school district is required to do 15 things. Five of the things aren't met, but there's a record of they're trying really hard and they're not fighting against those five things. They just haven't quite crossed the finish line. Good faith? That would be part of meeting good faith, Your Honor. So that is correct that it would be part of the showing is if they tried really hard. But in addition, they would actually have to have kept track of, analyzed why certain programs were effective and why certain programs were not effective. For example, to show why, in your hypothetical, why those other five requirements were not met out of the 15. Do you think the good faith standard has an element of outcomes because you have to assess data enough that you see the outcomes and evaluate them? It's not entirely reliant on outcomes, Your Honor, but it's actually, yes, using those outcomes to what strategies and programs were effective. If I understand your argument correctly, it's to show good faith. They would need to show if they weren't achieving certain outcomes, they would basically need to be able to explain why, that it wasn't due to their own failures but due to some other factors outside of their control? That would be part of it. Also, Your Honor, it could involve something like showing why one type of transportation program was working and one was not. Or specifically in our case, with regard to advanced learning experiences, actually looking at why students may enroll in certain advanced learning experiences and why they would not. And by that I mean Latino and African American students would enroll in them and why they would not. If I understand, the other part of your legal argument is that they have to do all this for a certain period of time or to show a certain duration to their good faith behavior, at least in this case. Because you're saying maybe they've shown good faith conduct for a short period of time but it's not long enough. That's what I understood. Correct. We interpret the case law, Your Honor, as being you have to eliminate the vestiges of past discrimination, which in this case would involve complying with the USP. You have to have good faith compliance, which as we've been discussing. And in addition, you have to be in compliance for a certain number of years. So problems in that section of the USP, as I was talking about earlier, quality of education persisted. And when the district court granted unitary status in 2021, so what I was talking about earlier with these objections about the use of data, those were in 2018 in a partial unitary status order. So fast forwarding to 2021 when there is the next big supplemental grant of unitary status, the district court still found that TUSD did not present data or argument, and this is quoting from the district court, quote, did not present data or argument that reflected any notable improvement in academic achievement as measured by AZ merit testing. This failure to show improvement included mentioning that there was no improvement in African American and Latino students' ability to score proficient on AZ merit scores over the preceding three years. This example illustrates not only that the district court applied the wrong legal standard for good faith, but also that there are real consequences to TUSD's failure to use data to determine the effectiveness of desegregation efforts. That is, in one section of the USP for which partial unitary status was granted in 2018, based on future compliance plans, problems persisted even when the district court granted unitary status in 2021 and 2022. We can see that these problems with not tracking progress and which programs were effective or not also went to perhaps the most obvious of the green factors, which is student assignment, which is students being at integrated or racially concentrated schools. As we ended the case, there were still just as many, in terms of the non-MAGNA schools, just as many racially concentrated schools as integrated schools. And that leads us into looking at the vestiges of discrimination, which the district court changed its standards on in certain areas, including on student assignment, where the USP is 15% plus or minus that ethnicity's percentage district-wide for that grade level. That percentage was changed to 25. So it relaxed the standard when it found unitary status in 2021. Why is that not legally permissible? I mean, their parties, everyone agrees upon the USP in a certain standard, as I understand it, is essentially a sort of a proxy for measuring the elimination of vestiges. And if the district court makes a reasoned decision and says, well, actually that's maybe too high for X, Y, and Z reasons, and I think they can show elimination of the vestige of discrimination by doing this other thing instead. I mean, the constitutional requirement is elimination of the vestige of discrimination, not necessarily the meeting of the first version of the USP standard. Is that correct? Yeah, it's not correct in that the USP is supposed to actually put out or lay out the requirements for achieving elimination of the vestiges of discrimination. So if you relax it that much, then you're not actually meeting it. Additionally, this 25% came from the special master. However, that was supposed to be for future compliance, meaning after unitary status was granted, not when we're supposed to be looking at whether the school district has been in compliance for several years, and if I may reserve the rest of my time for rebuttal. Thank you. We'll hear next from Mr. Salter.  I guess, excuse me. Ten years ago, approximately, in Fisher v. TUSD 652, Fed 3rd, 1131, set out what the district has to do in order to obtain unitary status, and I'm sure you're well aware of all of that. Now, in this particular case, we're saying from the black standpoint that the district, in its haste to close this longstanding school desegregation case, the trial court committed reversible error by finding the institutional defendant unitary, despite the defendant's failure to meet either of the two conjunctive showings required by a well-established Supreme Court, and the school district had the burden of doing this. They have that burden. Now, what is important here, you have to understand that in order to show that they did not act in good faith, and they had not eliminated the vestige of past de jure segregation, under the USP, they were, as previously stated here, that there were certain plans that were set out and agreed upon to accomplish this goal. One of them was DAP, and that's very important because black children were more than three and a half times likely to be disciplined, as opposed to the Anglos. That wasn't a plan that was set out to meet the requirements that the district become unitary, and what happened here is Judge Burry, incidentally the same parties, including myself, the school district, and Judge Burry were back here again for the same thing, in my opinion. The district court, this is what Judge Burry described DAP as one of the backbone strategies developed by the district to comply with the USP Section 6 on discipline. DAP was designed to reduce the length of out-of-school suspensions. The district court found that DAP reduces the length of out-of-school suspensions and is far superior to out-of-school exclusionary discipline. In 2021, the district court relied in part on TUSS use of DAP as one of the strategies for reducing racial imbalance. What do you say is the specific error with respect to DAP by the district court? What do I say? Well, the school district attempted to eliminate it without even, and I'll go through that very briefly. What happened was that the district, without notice to anyone, the rumor was going around they were going to get rid of DAP. The district denied it, and what happened was at a school board meeting, the clerk says, I've heard that they're going to change DAP, and nobody told us anything at all about it. And the school district then proceeded to go ahead with the plan. The special master then asked me and the Fisher plaintiffs if they could retroactively agree with the district's plan, and we said no. We then objected, and Judge Burry took a look at it, because he says by eliminating, or at least, or at best, significantly curtailing the critical in-person instruction, that's the key in this program,  TUSD has abandoned its primary mechanism to address its USP commitment to reduce the most damaging exclusionary discipline. The DAP program was developed under the USP as part of a graduated disciplinary system to specifically target exclusionary nature of long-term suspensions, the most damaging of disciplinary consequences. The core of DAP is its in-person classroom instruction and behavioral support. What had happened was the district would have... Counsel, you're over your time, so can you conclude your point? Oh, okay. Well, Judge Burry then, when we objected, ordered the ICC, Dr. Kelly Langford, to do a report on discipline. He did the report. It took him three months. He came back in January of 21, and he found that, yes, it's true, the district, as the plaintiffs have said, they just basically gutted and eliminated DAP. They just dismantled, would have dismantled the whole program if Judge Burry and the clerk had not stepped in. And Dr. Kelly's report verified everything that we thought would happen. And without DAP, that's just one example of the failure to act in good faith. Judge Burry also noted that in their budget, Terry, they changed things without his knowledge. He was concerned about that. And with all of those things, I don't see how the district can come in and say they're in compliance. Maybe in certain areas we conceded, certain areas they were. But the main thing right now, there has been no proof or showing that the programs that remain out there to be reviewed would show that there's been any progress. In fact, the graduation rate has dropped since the filing of this U.S.B. Four percent less black kids are graduating from high school. They're still three-and-a-half to four percent in discipline. They're in discipline. Judge Burry has indicated that these were concerns that he had. And I'm suggesting, Your Honor, that they have not complied with either of the problems. And the last problem, they failed to eliminate the past vestiges to the extent was practical. And so doing, they would have to have, the district would have to have shown some proof that they eliminated the constitutional violations that got them there 50 years ago. I suggest, Your Honor, that Judge Burry himself has concerns about whether or not they had acted in good faith. But instead, he went ahead and allowed them to, with all the criticism he had, he found that they had obtained unitary status. All right. Counselor, I've let you go quite a bit over your time. Appreciate it. Thank you. We'll hear from the school district now from Mr. Cooper. May it please the Court, my name is Ben Cooper. I represent the Tucson Unified School District No. 1. After nearly 50 years of litigation, the district court has found the school district, as a matter of fact, to be unitary and has released the school district, its 89 schools that's serving 40,000 students, to the control of its governing board and Superintendent Trujillo and has terminated judicial supervision. The district court did this after years under the unified status plan since this court remanded Fisher, of demanding detailed and relentless supervision and regulation of every aspect of the district's operations. The court made findings of fact in hundreds of pages of orders. And it's not enough to go back and cite something that was said in 2008 or something that was said in 2018 and neglect what the district court found in 2021-2022 when it recognized that the district had met all of its requirements, had satisfied all of the concerns, and was in unitary status. Counsel, I want to focus you on some of the questions that I was asking your friend across the aisle. If we go back and conference this case and conclude that there's a few things that weren't satisfied under the plan, what do we do with that in terms of the good faith and the vestiges of discrimination factors? The case law detailed in our brief indicates that near perfection is not the standard. The question is, have the vestiges been eliminated to the extent practicable? The district court found that they had. And so if we, again, this is a hypothetical, if there's 15 things that you have to do and we find that there's problems with three of them, do we think of that in terms of good faith? Do we think of that in terms of have you eliminated the vestiges of discrimination? The briefing in this case, there was a lot of argument about facts and history and what, you know, the different programs and whatever, and there wasn't a lot of connection of that discussion to the legal standard. And I'm struggling with which box am I in. Your Honor, the box, there are two boxes. The first box, the elimination of vestiges of discrimination. The district court found as a matter of fact that they'd been eliminated. And under Fisher, counsel is wrong. It's not a mixed question of law and fact. The Ninth Circuit, this court, indicated in Fisher that it reviews for clear error the determination of unitary statute. Your mind, is that determination by the district court connected to performance under the plan, or is that its own separate inquiry? It is performance of the plan was, in this case, the district court's yardstick for measuring good faith. That's what it was about. Okay, so you're meshing the things. We were talking about eliminating the vestiges of past discrimination. Is performance of the plan relevant to that inquiry or not? It's relevant as a yardstick, but the fact is that regardless of what the extent of completion was, and the district court found that we had completed, substantially completed all the elements of the plan, and it went stage by stage. 2018, it found we had met many of the provisions, but not all of them. 2021, it found that we had attained other ones, and it had a couple of things it was concerned about. And 2022, it finally determined that we had crossed all the Ts and dotted all the Is. We had fixed all the cross-links on the website. We had corrected the typographical errors, and we were there. So the questions that the plaintiffs raise are not matters of good faith. They're not matters of elimination of the vestiges. In pages 27 and 28 of our brief, we cite all the case law that says outcomes are not a green factor, and they're not an element because there are a lot of things that influence outcomes, educational outcomes, achievement outcomes, other than vestiges of discrimination. And the district court found that we had satisfied the good faith commitment. Okay, so I understand your argument is you've done all the things the plan demanded of you. Yes. If we disagree, which analysis do you think that we think of in dealing with? If we find there's two things in that plan that actually the district didn't quite meet, how do we assess that? Do we assess that as good faith? Well, it could be analyzed in terms of good faith, but that kind of satisfaction of all the elements of the plan is not necessary for good faith. As the Manning case we cite and a number of other cases dealing with school desegregation actions have indicated, all good faith means is that the district has accepted its responsibilities to eliminate discrimination and is not at risk, essentially, of backsliding, of returning to intentional discrimination in the future. It's failure to achieve a near-perfect world that no school district in Arizona or I dare say in the United States has reached. I guess I'm not quite following the argument because the articulation of good faith from the cases, and particularly Jenkins, which is a Supreme Court case, basically says that that question is about has the district complied in good faith with the desegregation decree since it was entered. And where we are right now in this case, the USP is the decree that we're looking at. So it can't be divorced from compliance with the plan. But the district court found that we had complied, and we went through each of the sections of the USP in our brief, over about 25 pages of our brief, with no response from the plaintiffs in the reply brief, detailing where the court found that we had complied with every provision. If not by 2018 and if not by 2021, then by 2022.  Is the legal standard 100% compliance with the USP to show both good faith and or vestiges of discrimination, or is some kind of substantial compliance? And if it's substantial compliance, what is your legal support for the idea that it can be less than 100% compliance to show either good faith or elimination of vestiges? Your Honor, the standard is elimination of vestiges to the extent practicable. The district court found, as a matter of fact, that we had done that. Regardless of whether the compliance— because a lot of the provisions of the USP have nothing to do with vestiges. They have nothing to do with green factors. Some of the last things had to do with post-unitary transparency and transition to local control that were not about vestiges and not about good faith. But we still complied with all of that. So the question that the district court found, the vestiges were eliminated to the extent practical, which is the legal standard, regardless of what plaintiffs said we did or didn't meet. Sir, I understand you saying the USP was an agreed-upon yardstick for measuring both good faith and elimination of vestiges, but it's a yardstick that went above and beyond. It went above and beyond what was constitutionally required to show good faith and elimination of vestiges. So if the part that there was some gap in compliance doesn't bring you below good faith and elimination of vestiges, there's no constitutional problem with finding unitary status. Is that a fair way to put it? That's a fair reading. Because one of the arguments that we had made, and contrary to what counsel said in their reply brief, we preserved extensively, probably 30 times in the record, is that we thought the analysis of Judge Frye in 1978 and the district court in 2008 had satisfied the constitutional requirements of the elimination of vestiges. But none of that really matters now. So that's been preserved. But none of that matters now because after six years, I guess nine years under USP, the district court found that we had eliminated the vestiges and that we had to substantially apply with all the provisions of the USP because Lord knows at the end we were down to, you know, cross-links on web pages of the district. And it found that we had been operating for 11 years in good faith. And good faith in this sense is not you've done everything you can to make this the perfect school district. There is no such thing in Arizona or any place else. The district court, for example, found... In talking, for example, counsel mentioned transportation. The district court found that the issues in transportation were not a vestige of discrimination. They were a fact that Arizona has universal open enrollment. It has charter schools. It now has universal vouchers. And so it's not you just go to your local school. It's you go everywhere. And so the districts have been playing catch-up, districts throughout the state, regardless of whether they had ever been segregated, to deal with the problems of the system in which all the schools operate. And the district court recognized these were not vestiges of any discrimination. They were simply challenges that all school districts face. So saying we did not comply with every... The aspirate, the plan, for example, will say you have to seek to close the gap. Not that you have to close the gap in academic achievement, but the district has to have programs to seek to do so. The court found we had plans and implemented them to seek to close the gap, not to close the gap because... And that's why the courts have said educational outcomes are not the metric because they are often beyond the poor power of school districts to add or subtract. They are simply, you know, the districts can do the best they can, and in this case, the court found that the TUSD had done so. An example, you know, council brings up the DAPE program. The DAPE program was never dismantled. In the middle of the COVID crisis, because kids were not in school, the district had proposed transferring a couple of the DAPE teachers to do other things because kids were... The schools were locked down. The district court found, the council that has this habit, they quoted the order to show cause, not the ultimate findings that the district court made in 2021, 2022, where the court found, it's detailed in our brief, DAPE was never dismantled, it's still up and running, and the district can't do it until it goes through the performance impact analysis and looks at all the circumstances. So DAPE is still there now. There was no intent to dismantle it. There was intent of a lot of districts to deal with COVID and staffing crises in the middle of a COVID pandemic. That's not a lack of good faith, and the district court found that we did not act in bad faith, that we acted in good faith, and the court found unitary status. This is an issue of fact, and this court noted that courts have... That's a great deference to the district court in these school desegregation cases simply because they are so complicated factually, and if the court reviews the orders, the alphabet soup of initialisms and acronyms leading us to have what I realized was not even a complete glossary at the beginning of our brief to keep track of it. The numbers, the data, the recommendations from Professor Hawley, the University of Maryland education professor who was a special master, the objections by one side or another, the responses to the objections. The district courts further ordered for annual reports and compliance reports and action plans. This was the most carefully regulated district possibly in the history of Arizona, if not in the history of the West. And after all of that effort, the district court found that we had met the constitutional standards, which were the elimination of the vestiges, to the extent practical, and good faith commitment to the Constitution and to our obligations under the unitary status plan. And the court did not release jurisdiction and terminate supervision until it had come to the end. In 2018, 2021, and 2022. And when you read the progress, the step-by-step analysis, okay, you're here now. I need you to do a couple more things. Okay, you know, you've done that. We've come up with a couple more things we need you to do. And the court kept working everyone through, and at some point, you know, the Supreme Court has indicated Freeman v. Pitts and the majority, and Justice Scalia's dissent in 19... concurrence in 1992, that the time comes. You have to return control to the local leadership. In this case, the governing board and Superintendent Trujillo. And, you know, that was 30 years ago. We're 30 years on and nine years under a detailed unitary status plan. And, you know, nothing that... And the district court found that the district is fully committed to doing the best it can for all the kids and to keeping the focus on all the programs it has. And there's no justification for, you know, for reversing and remanding for what? The plaintiffs have never indicated if this court would reverse, what would happen? What more could be done? What did the district... What T's were crossed, what I's were dotted in terms of what the district court could have us do? Or could... The plaintiff's essential complaint is that the district could do better. Every district could do better, regardless of whether it had ever been segregated. This district has out-achieved in many respects in the DAPE and the discipline. The district court found that, in fact, it had closed the gap between Hispanic and white students and that the discipline levels for African-American students, where the gap was not completely eliminated, was below the national average. You know, there are some factors out there that are not within the school's ability to control and completely eliminate all differences. But the court found that we had eliminated the vestiges and that we had acted in good faith and shown our commitment to racial equality and to our constitutional obligations. And that is the standard. The USP provisions that, you know... It's easy to characterize the USP provisions as, you have to do this. And the plaintiffs say, well, that's in terms of outcome. But that's not what the USP says. The USP says it's in terms of the effort, because that's all any district can do. It can make the effort. And the district court said, you've made the effort, you've made it in good faith, you've complied with all the provisions that are detailed in our brief, and it's time to come to an end. We have attempted to establish the factual basis. It is enormous. I mean, there are 3,700 or something like that, docket entries, and that's all... Not legal briefing, that's factual analyses going back and forth between the special master and the parties and the court and the special master and the parties. And finally, the special master, Professor Hawley, recommended unitary status to the district court after further briefing found that it was acceptable, and they have not attempted to show clear error, and they have not attempted to identify any legal error. You know, whether or not you have a 15% discrepancy or a 25% difference, that's not a legal standard. These are all yardsticks that courts in their discretion may adopt to try to measure things. And that's not legal error in the district court. They never made an effort to show that it was legal error. If you look at the Fisher case and you look at... The court found in Fisher that the district court's own factual findings were fatal to its grant of unitary status. That isn't the case now. Thank you, Your Honor, unless you have further questions. Thank you. Thank you, counsel. All right, we'll hear rebuttal from Mr. Arreda. Yes. Thank you, Your Honor. I just want to reiterate that with regard to good faith, the standard there is... The standard of review is de novo. When we're looking at good faith, we have to... We're not talking about the quantum of compliance with the USP. Which case says that it's de novo? I think this case, Your Honor, says that it would be... After 2008, when the district court had findings related to a lack of good faith, and then the district court found, based on that held, that there was a lack of good faith. But there's a difference between that type of legal error and then what I think would be here are more quintessentially factual findings about what the district has done and the reasons why it has or has not done something. I think the way I can distinguish it, Your Honor, rather than, like I said, it being a quantum of how much the school district has achieved, it's the school district along the way with those efforts not actually tracking and monitoring the data and analyzing those data or other information to make sure that those programs are successful. I would say if the district court found, as a matter of fact, that the school district had done that kind of monitoring, wouldn't that be something we review for clear error? If the district court had found that and we were appealing, then yes, the standard would be clear error. But you're saying the district never, in fact, found the requisite monitoring to establish good faith. That's your argument. Yes, Your Honor. We're saying the district court let the school district off the hook without making that analysis. But a prior decision in Fisher, we said, aware of the deference owed district courts in such cases, we review the court's findings of fact, including its finding of unitary status for clear error. So that seems to suggest the standard of review on the components of the unitary status test is clear error. I think that was when they were looking at whether those provisions were complied with, whether there were facts to show that there was compliance with the USP. Here, when we're looking at compliance with the USP, we're not just saying that there was not enough showing of complying with the USP. So setting aside good faith for a second and looking at the elimination of the vestiges of past discrimination, now when we're talking about the USP, our argument is we are saying that the USP, that the district court changed its standards for examining what facts would be needed to show unitary status. But to go back to good faith, this is from Freeman versus Pitts. When a school district has not demonstrated good faith under a comprehensive plan to remedy ongoing violations, we have without hesitation approved comprehensive and continued district court supervision. That is what we're asking for here today because there was not a proper application of the standard for good faith. And more broadly, supervision has to continue. When the school district talks about its achievements here today and talks about how much it's complied with the USP, let's look back at the USP. The USP says it's supposed to be closing the achievement gap in the area of quality education for Latino and African American students. The USP says every student has a right to attend an integrated versus a racially concentrated school. If this case ends now, we are ending the case where there are just as many non-magnet racially concentrated schools as integrated schools. We are ending the case where there has not been significant progress on closing the achievement gap for Latino students versus white students and African American students versus white students. There has to be... We have to leave this case, if we're going to leave it, with the full... with the correct analysis, the correct application of the legal standards, or else the children who are there will not enjoy their constitutional right to an equal education. Thank you. Thank you, counsel. Thank counsel for both sides in this case for their helpful arguments. And the case just argued will be submitted, and we are in recess for the day.
judges: COLLINS, FORREST, SUNG